998 A.2d 369

**Eyrania SMITH**

v.

**Michael BORTNER.**

**No. 2667, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

July 7, 2010.

Paul Hollifield (Karl H. Goodman, on the brief) of Balti-more, MD, for appellant.

Adam Rodenblatt (John E. Beverungen, County Atty., Jeffrey G. Cook, Asst. County Atty., on the brief) Towson, MD, for appellee.

Panel: DAVIS, WOODWARD and ZARNOCH, JJ.

ZARNOCH, J.

In this appeal, we are asked to determine the appropriate State constitutional standard for a claim that police used excessive force on a citizen in custody following a valid arrest. The unfortunate circumstances described below led Eyrania Smith, appellant, to file suit in January 2008 in the Circuit Court for Baltimore County against Michael Bortner, appellee, an officer of the Baltimore County Police Department. In that suit, she alleged that the officer mistreated her following her arrest while she was in custody at a Baltimore County police station awaiting transfer to the Baltimore City Police Department. The complaint alleged that Bortner violated Smith's rights under Articles 24 and 26 of the Maryland Declaration of Rights, and that he committed several common law torts. In December 2008, the circuit court granted summary judgment to Bortner on all counts of the complaint. In this appeal, Smith challenges only the rejection of one of her constitutional claims and contends that the circuit court failed to apply the correct standard for determining whether the officer's conduct violated Article 24. For the reasons that follow, we affirm the circuit court's order granting summary judgment.

## FACTS AND PROCEEDINGS

On Saturday morning, March 26, 2005, Smith was driving with her children on Interstate 83 in Baltimore County, when Officer Gibbons of the Baltimore County Police Department stopped her for speeding. The officer learned that there was an outstanding warrant for Smith's arrest that had been issued by the District Court for Baltimore City in 2001.[1]

---

1. The warrant arose from a probation before judgment appellant received on February 27, 2001, after pleading not guilty to a fraud claim

Despite Smith's protests that the police record of a warrant was mistaken, at 9:08 a.m., the officer arrested and handcuffed Smith and transported her to the Cockeysville precinct station. Smith's car was left at a Park–and–Ride near I–83. Smith's two daughters, who were seventeen and eight or nine, respectively, were left alone in the car.[2] At approximately 9:20 a.m., Officer Michael Bortner, the booking officer at the station, fingerprinted and photographed Smith. Bortner then had Smith sit down on a bench near a wall in the fingerprinting room, handcuffed her left wrist to a pole above her seat, and shackled her ankles to a pole running parallel near the bottom of the wall.

The Baltimore County police then notified the Baltimore City Police Department that Smith was in custody and requested that the City police pick her up. However, City police officers did not arrive. According to the arrest report, at 2:15 p.m., the County police contacted the City police, who said its

asserted against her by Rent–A–Center. As conditions of probation, appellant was required to pay $215.61 restitution to Rent–A–Center and periodically report to her probation supervisor at the Department of Public Safety and Correctional Services. On April 30, 2001, the Department requested that the District Court issue a bench warrant, stating that appellant violated her probation by failing to (1) report to her supervisor or respond to the supervisor's communications, (2) provide verification of employment, and (3) pay restitution. The request indicated that "[t]he restitution has not been paid to date." On June 20, 2001, the District Court issued a bench warrant for appellant's arrest.

On March 5, 2002, the Department filed a request to recall the bench warrant, stating that, although it requested a warrant on April 30, 2001, "an earlier docket entry on 3/21/01 states 'money paid case closed per Judge Bass.' Therefore it appears to be no basis for the Violation of Probation and a recall of the bench warrant is requested." According to appellant, she paid the restitution on February 27, 2001, the day the PBJ was ordered. Nevertheless, on March 26, 2005, when Officer Gibbons ticketed appellant, the District Court still had not recalled the warrant and the police records indicated that the warrant was outstanding.

2. Smith's seventeen-year-old daughter did not have a driver's license at the time. The children contacted Smith's husband, who traveled two hours from his workplace in Pennsylvania and picked them up. Smith's car was left at the Park–and–Ride.

4 p.m. to midnight shift would handle the matter. At 5 p.m., the County contacted the City again to obtain an estimated time when police would arrive and were told that the City's midnight shift would handle the matter. Around midnight, after City police still had not come, County officers transported Smith to Baltimore City police custody.

During most of her stay at the Cockeysville station, appellant remained handcuffed and shackled to the wall. According to Smith, she repeatedly told Bortner and other officers that the warrant was a mistake. Appellant said at her deposition that the police told her that she could not be placed in a cell because all three of the station's cells were occupied by men. Appellant also stated that an officer called a nearby prison that houses women to inquire if there were empty cells, but was informed that there were none. Appellant was diabetic and a number of times asked about obtaining the insulin she had left in her car so she could inject herself. Her requests were denied, and appellant testified that an officer told her that she would "be fine" without her insulin for a day. In her deposition, appellant recounted a phone conversation one officer had with her husband about getting her insulin: "What I heard him say to my husband was, we're not a hospital facility, and we can't allow her to inject herself here." Smith also complained about the shackles cutting into her ankles, but she said that her complaint was ignored. According to appellant, police officers' children were at the station that day for an Easter party, and they ran into the room in which she sat and called her a "jailbird." Around 5:15 p.m., she was moved from the fingerprinting room to the hallway of the station and remained handcuffed there. The record is silent on whether she was handcuffed and shackled to a pole as in the fingerprint room. The arrest report indicates that appellant used the restroom twice and was fed at 5 p.m. According to appellant, she was offered a sandwich, but was so disgusted that she gave it to a prisoner who was being held in a nearby cell. She accepted the drink the police offered her. Police records indicated that Bortner worked a 6 a.m. to 2 p.m. shift

that day, and thus, at most, was involved with appellant for about four and a half hours.

According to appellant's complaint, after being transferred to Baltimore City, the police advised her that there was no outstanding warrant for her arrest. She was released at approximately 12:54 a.m. on March 27, 2005. On Monday, March 28, 2005, appellant went to the District Court for Baltimore City and informed the judge who had sentenced her in 2001 about the weekend's events. The judge recognized the mistake and, that day, issued an order recalling the bench warrant.

Appellant was examined by a physician on April 6, 2005. In a report, the doctor diagnosed her as suffering from strains to her left shoulder, spine, hips, and chest, a sprain to several areas of her left arm, and a left ankle contusion/sprain. He also wrote that Smith suffered post-traumatic headaches and anxiety. The doctor recommended physical therapy and referred Smith to an orthopedic surgeon. He ordered Smith to refrain from working, but did not indicate a time frame for her return to work. At her deposition, appellant said that she went back to her job as a cashier at Walmart shortly after the incident, but nearly "had a nervous breakdown at the [cash] register." According to appellant, she was unable to return to work thereafter.

On January 2, 2008, appellant filed a complaint against Bortner, individually and in his official capacity, alleging counts of: (1) battery; (2) false arrest; (3) false imprisonment; and (4) violations of Articles 24 and 26 the Maryland Declaration of Rights.[3] The complaint stated that Bortner shackled

---

**3.** Article 24 of the Maryland Declaration of Rights provides:

> That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

Article 26 of the Maryland Declaration of Rights provides:

> That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or

her "to a pole with her left wrist above her head and both ankles shackled for 12½ hours," and that she "repeatedly advised Officer Bortner and others that there was no warrant against her and that she was diabetic and could not remain in [the] position" in which she was placed. She alleged that she suffered "serious, painful and permanent bodily injuries, great physical pain and mental anguish, severe and substantial emotional distress and loss of the capacity for the enjoyment of life," and incurred medical expenses as a result. The complaint sought $1 million compensatory and $1 million punitive damages.

On May 14, 2008, Bortner moved for summary judgment on all counts, arguing that the basis of the complaint was that the police acted without an arrest warrant, but in fact the police acted on a facially valid outstanding bench warrant, which was not recalled until two days after the arrest. On May 30, 2008, appellant filed a response, countering that the warrant "was an error and ultimately quashed," and that appellant repeatedly advised the police that there was a mistake. Appellant further stated that her claims did not arise from the arrest itself, but from the manner in which the officer treated her while holding her at the station.

In a ruling dated August 8, 2008, Judge John F. Fader II denied the motion, noting that "there is much more in the Complaint filed than an allegation that [appellant] was arrested without a warrant," including allegations about the amount of time and the manner in which the Baltimore County police held her. He ruled that "summary judgment [was] inappropriate on the facts presented by the motion[.]"

Subsequently, Smith was deposed. On September 26, 2008, Bortner moved a second time for summary judgment, arguing that appellant could not prevail on her claims of battery, false arrest, and false imprisonment, because the warrant provided legal justification for the arrest. Bortner further argued that

to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted.

he enjoyed public official immunity unless he acted with malice, and there was no evidence of malice. Lastly, Bortner argued that the claims of violations of Articles 24 and 26 of the Maryland Declaration of Rights should fail because the conduct complained of did not "shock the conscience" or amount to "punishment."[4] Judge Judith Ensor heard oral argument on the motion on December 18, 2008. That day, she granted appellee's motion as to counts 1, 2, and 3, but reserved judgment on count 4, the constitutional claims. On December 30, 2008, she granted summary judgment to appellee on count 4, explaining that in order for appellant to prevail on her claim that Bortner committed constitutional torts by using excessive force against her, Bortner's conduct must "shock the judicial conscience." The court found that Bortner's conduct did not rise to that level and was also "objectively reasonable."

Smith timely noted an appeal on January 30, 2009.

## QUESTION PRESENTED

We have slightly rephrased the single question appellant has presented:

Whether the circuit court applied the correct standard for determining whether appellee's conduct violated appellant's constitutional rights?[5]

---

**4.** In addition to pointing to cases on these two due process standards, the County Attorney's memorandum in support of summary judgment cited Maryland caselaw that articulated an Article 24/Article 26 test that focuses on whether the police use of force was "objectively reasonable." *See Randall v. Peaco*, 175 Md.App. 320, 330, 927 A.2d 83 (2007); *Hines v. French*, 157 Md.App. 536, 575, 852 A.2d 1047 (2004).

**5.** Appellant presented the following question verbatim:

Did the judge below apply the correct standard in granting Appellee's Motion for Summary Judgment?

Although this very general question could encompass a challenge to the summary judgment on counts 1–3, appellant's argument does not mention the judgment on those counts, except for stating that "[t]he judge below expressed no reasons for granting Appellee's Motion for Summary Judgment as to Counts 1, 2, and 3." Since appellant presented argument to this Court solely regarding the summary judgment on

## DISCUSSION

We review a grant of summary judgment *de novo*. *Beyer v. Morgan State Univ.*, 369 Md. 335, 359, 800 A.2d 707 (2002). Maryland Rule 2–501 authorizes a grant of summary judgment where "there is no genuine dispute as to any material fact and . . . the party is entitled to judgment as a matter of law." "When reviewing the grant or denial of a motion for summary judgment we must determine whether a material factual issue exists, and all inferences are resolved against the moving party." *Olde Severna Park Improvement Ass'n v. Gunby*, 402 Md. 317, 328, 936 A.2d 365 (2007) (citation and quotations omitted). "[O]nce we have concluded that there is no genuine issue of material fact, our standard of review is whether the trial court was legally correct." *Reiter v. ACandS, Inc.*, 179 Md.App. 645, 659, 947 A.2d 570 (2008) (citation and quotations omitted).

### A. Article 24 or Article 26?

This case is presented to us as arising solely under Article 24 of the Maryland Declaration of Rights, with the parties inviting us to choose from one of two due process standards: "shock the conscience" or excessive force "amounting to punishment." In the circuit court, Smith claimed that Officer Bortner violated her rights guaranteed by Article 24 and Article 26. In this Court, on the basis of *Robles v. Prince George's County*, 302 F.3d 262, 268 (4th Cir.2002), she has abandoned any contention of wrongful arrest or resultant excessive force under Article 26.[6] Nor does she contend that the appropriate due process standard in a case of excessive force against a detainee is derived from Article 26's proscription against unreasonable seizures.

———

the Article 24 portion of count 4, we address only that contention. *See* Md. Rule 8–504(a)(5).

**6.** Contrary to some federal courts, *see infra* pp. 547–48, 998 A.2d 369, pp. 376–77, *Robles* concluded that the Fourth Amendment's prohibition of unreasonable seizures does not apply beyond the initial arrest to pretrial detention situations.

■ At first blush, this appears to be a surprising concession for two reasons. First, the standard for gauging excessive force under the Fourth Amendment/Article 26 is more plaintiff-friendly than a due process standard. *See Harris v. City of Circleville,* 583 F.3d 356, 365 (6th Cir.2009) ("A substantially higher hurdle must be surpassed to make a showing of excessive force under the Fourteenth Amendment than under the 'objective reasonableness' test...."). *See also* Comment, Jill I. Brown, *Defining "Reasonable" Police Conduct: Graham v. Connor and Excessive Force During Arrest,* 38 UCLA L.Rev. 1257, 1270 n. 86 (1991) ("[I]t is more difficult to show that the defendants' use of force amounted to punishment (under the Due Process Clause) than to merely prove that it was unreasonable (under the Fourth Amendment)."). Second, Maryland cases have said that the standard for analyzing claims of excessive force by police officers are the same under Articles 24 and 26 of the Maryland Declaration of Rights and that the test is one of objective reasonableness, as set forth in the U.S. Supreme Court's Fourth Amendment case of *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). *See Okwa v. Harper,* 360 Md. 161, 203–04, 757 A.2d 118 (2000) [7]; *Randall v. Peaco,* 175 Md.App. 320, 330, 927 A.2d 83 (2007); *Hines v. French,* 157 Md.App. 536, 574–75, 852 A.2d 1047 (2004); *Branch v. McGeeney,* 123 Md.App. 330, 338, 718 A.2d 631 (1998); *Williams v. Prince George's County,* 112 Md.App. 526, 547, 685 A.2d 884 (1996). *See also Richardson v. McGriff,* 361 Md. 437, 452, 762 A.2d 48 (2000).[8] However, a closer look at these Maryland decisions and the Supreme Court's opinion in *Graham* suggests that appellant may have not conceded very much.

Each of the above-cited Maryland cases involved a claim of excessive force in a pre-arrest setting or during the course of

---

**7.** In *Okwa,* only an Article 24 claim was raised. 360 Md. at 174, 757 A.2d 118.

**8.** In *Richardson,* although the plaintiff originally brought claims under both Articles 24 and 26, only an Article 26 claim was presented to the jury and relevant on appeal. 361 Md. at 441, 762 A.2d 48.

an arrest. None presented the issue of excessive force after a person had been taken into custody following a valid arrest. The same is true of *Graham.* There, the majority opinion of the Supreme Court said that all claims that law enforcement officers have used excessive force "in the course of" an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard rather than under a substantive due process approach. 490 U.S. at 395, 109 S.Ct. 1865. In a footnote, the Court went on to observe:

> Our cases have not resolved the question whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins, and we do not attempt to answer that question today. It is clear, however, that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment. *See Bell v. Wolfish,* 441 U.S. 520, 535–539, [99 S.Ct. 1861, 60 L.Ed.2d 447] (1979).

*Id.* n. 10.[9]

By declining to address this issue, and to define the point at which an arrest ends and pretrial detention begins, *Graham* spawned disagreement among the federal circuits about the source and standard of constitutional protection afforded an individual against excessive force in police custody. It has been said that "[b]etween arrest and sentencing lies something of a legal twilight zone." *Wilson v. Spain,* 209 F.3d 713, 715

---

**9.** In the same salient footnote, the Court completed the arrest-to-conviction equation, stating:

> After conviction, the Eighth Amendment "serves as the primary source of substantive protection ... in cases ... where the deliberate use of force is challenged as excessive and unjustified." *Whitley v. Albers,* [475 U.S. 312, 327, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)]. Any protection that "substantive due process" affords convicted prisoners against excessive force is, we have held, at best redundant of that provided by the Eighth Amendment. *Ibid.*

*Id.*

(8th Cir.2000). *See also infra,* pp. 548–49, 998 A.2d 369, pp. 377–78.

Some federal circuit courts have held that only the Fourteenth Amendment Due Process Clause, not the Fourth Amendment, protects individuals that are in police custody after an arrest, relying on the language of the Fourth Amendment and *Bell v. Wolfish,* 441 U.S. 520, 535–36, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), in which the Supreme Court held that pretrial detainees are protected by the Due Process Clause's prohibition on punishing an individual prior to an adjudication of guilt. In *Riley v. Dorton,* 115 F.3d 1159, 1163 (4th Cir. 1997) (en banc) (quoting *Bell,* 441 U.S. at 533–34, 99 S.Ct. 1861), *abrogated on other grounds by Wilkins v. Gaddy,* —— U.S. ——, 130 S.Ct. 1175, —— L.Ed.2d —— (2010), the United States Court of Appeals for the Fourth Circuit noted the split among federal circuit courts on this issue, but rejected the "continuing seizure" theory of the Fourth Amendment and held that "the Fourth Amendment ... applies to the 'initial decision to detain an accused,' not to the conditions of confinement after that decision has been made." The court held that "*Bell* instructs us to analyze excessive force claims of pretrial detainees under the Due Process Clause of the Fourteenth Amendment." *Id.* at 1162. *See also Robles v. Prince George's County, supra,* 302 F.3d at 268.

In *Brothers v. Klevenhagen,* 28 F.3d 452, 456 (5th Cir.), *cert. denied,* 513 U.S. 1045, 115 S.Ct. 639, 130 L.Ed.2d 545 (1994), the United States Court of Appeals for the Fifth Circuit likewise held that the Fourth Amendment does not apply after the initial arrest, citing three reasons:

First, the text of the Fourth Amendment—prohibiting unreasonable "seizures"—does not support its application to a post-arrest encounter. Second, the Supreme Court has refused to apply the Fourth Amendment to protect inmates after incarceration. And third, *Graham* [, 490 U.S. at 395 n. 10, 109 S.Ct. 1865] and *Bell v. Wolfish,* 441 U.S. 520 [99 S.Ct. 1861, 60 L.Ed.2d 447] (refusing to concede that Fourth Amendment applied to pretrial detainee subjected to body cavity search), dictate that the Due Process Clause is the appropriate constitutional basis for pretrial detainee excessive force suits.

(Citation omitted). *See also Valencia v. Wiggins,* 981 F.2d 1440, 1444 (5th Cir.1993) (holding that "the concept of 'seizure' in the Fourth Amendment is not so capacious or elastic as to cover pretrial detention three weeks after the initial arrest").

The Seventh Circuit, as well, has consistently rejected the concept of a "continuing seizure" protected by the Fourth Amendment. *Wallace v. City of Chicago,* 440 F.3d 421, 429 (7th Cir.2006); *McCullah v. Gadert,* 344 F.3d 655, 661 (7th Cir.2003); *Reed v. City of Chicago,* 77 F.3d 1049, 1052 n. 3 (7th Cir.1996); *Wilkins v. May,* 872 F.2d 190, 192–94 (7th Cir.1989). The First Circuit has rejected the view that a Fourth Amendment seizure lasts through a defendant's trial. *Nieves v. McSweeney,* 241 F.3d 46, 55–56 (1st Cir.2001). The Eleventh Circuit has also held that claims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause. *Danley v. Allen,* 540 F.3d 1298, 1306 (11th Cir.2008).

The Second, Third, Sixth, Eighth, Ninth, and Tenth Circuits, however, have extended Fourth Amendment protections beyond a suspect's initial arrest to include, to various degrees, some of the time during which the suspect remains in police custody. *See Powell v. Gardner,* 891 F.2d 1039, 1044 (2nd Cir.1989) ("We think the Fourth Amendment standard probably should be applied at least to the period prior to the time when the person arrested is arraigned or formally charged, and remains in the custody (sole or joint) of the arresting officer."); *McDowell v. Rogers,* 863 F.2d 1302, 1306 (6th Cir.1988) (holding that a Fourth Amendment seizure "continues throughout the time the person remains in the custody of the arresting officers"); *Wilson v. Spain,* 209 F.3d 713, 715–16 (8th Cir.2000) (analyzing claims of excessive police force after an arrest under the Fourth Amendment reasonableness standard); *Torres v. City of Madera,* 524 F.3d 1053, 1056 (9th Cir.2008); *Pierce v. Multnomah County,* 76 F.3d 1032, 1043 (9th Cir.1996) ("[T]he Fourth Amendment sets the applicable constitutional limitations on the treatment of an arrestee detained without a warrant up until the time such arrestee is released or found to be legally in custody based upon probable

cause for arrest."); *Robins v. Harum*, 773 F.2d 1004, 1009–10 (9th Cir.1985); *Austin v. Hamilton*, 945 F.2d 1155, 1160 (10th Cir.1991) (concluding that the Fourth Amendment's protections "impose restrictions on the treatment of the arrestee detained without a warrant"). *See also DiBella v. Borough of Beachwood*, 407 F.3d 599, 602–03 (3rd Cir.2005); *Torres v. McLaughlin*, 163 F.3d 169, 174 (3rd Cir.1998) (stating that "there may be some circumstances during pre-trial detention that implicate Fourth Amendment rights"); *Albright v. Oliver*, 510 U.S. 266, 276–81, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (Ginsburg, J., concurring) (advocating that an individual who is released from police custody pending trial should be considered "seized" within the meaning of the Fourth Amendment because such a person "is scarcely at liberty; he remains apprehended, arrested in his movements, indeed 'seized' for trial, so long as he is bound to appear in court and answer the state's charges"); Eamonn O'Hagan, Note, *Judicial Illumination of the Constitutional "Twilight Zone": Protecting Post–Arrest Pretrial Suspects from Excessive Force at the Hands of Law Enforcement*, 44 B.C. L.Rev. 1351 (2003); Tiffany Ritchie, Note, *A Legal Twilight Zone: From the Fourth to the Fourteenth Amendment, What Constitutional Protection is Afforded a Pretrial Detainee?*, 27 S. Ill. U. L.J. 613 (2003); Irene M. Baker, Comment, *Wilson v. Spain: Will Pretrial Detainees Escape the Constitutional Twilight Zone?*, 75 St. John's L.Rev. 449 (2002).

There appears to be no Maryland case adopting or rejecting the "continuing seizure" rationale for an Article 26 or a Fourth Amendment excessive force claim and the parties have not asked that this be the first. As noted earlier, Smith seems to assume the correctness of the Fourth Circuit's view in *Robles, see supra*, n. 6, and accompanying text, and has abandoned her Article 26 claim. Although the circuit court apparently applied the Article 26/Fourth Amendment standard of objective reasonableness—in addition to the due process shock-the-conscience test—in upholding the appellee's actions, Smith did not ask the circuit court to apply the less burdensome of the

two standards.[10] Waiver aside, this case seems to be a poor vehicle to address the issue. Appellant's arrest was valid. She has not sued the arresting officer. Rather, the sole defendant named was the booking officer, who was present for only 4½ hours of the custodial period.

Although no analysis of unconstitutional excessive force by police would have been complete without discussion of the above-cited authorities, we believe the focus of this appeal must be limited to the choice of the substantive due process standards advanced by the parties.

### B. Shock the Conscience or Force Amounting to Punishment?

■ The parties have staked out widely divergent positions on the appropriate due process standard governing excessive police force against a pre-trial detainee.[11] Bortner now argues that the sole standard governing the excessive force conten-

---

**10.** It was appellee who called the objective reasonableness cases to the attention of the court. *See supra,* n. 4.

**11.** Bortner suggests in his brief that Smith may have enjoyed even less protection than Article 24 would afford her because the arrest warrant was the result of a violation of a probation before judgment appellant received in 2001, and a judgment of probation means she was found guilty. *See Howard County Dept. of Social Services v. Linda J.,* 161 Md.App. 402, 410, 869 A.2d 404 (2005). He contends that only the Eighth Amendment, which protects convicts from cruel and unusual punishment, provided appellant protection. This was not the basis for the circuit court's decision on summary judgment. Thus, this contention is not before us. *See Conaway v. Deane,* 401 Md. 219, 243, 932 A.2d 571 (2007) (stating that as a general rule, Maryland appellate courts will consider only the legal grounds upon which the trial court relied in granting summary judgment). Even if properly presented here, this argument is incorrect. The arrest warrant issued against appellant was based on an *alleged* violation of her probation. At the time she was arrested by the Baltimore County police, she had never been adjudicated guilty of violating her probation, and it became clear subsequently that she, in fact, did not violate probation. Indeed, the warrant was based on an erroneous report of her probation officer and should have been corrected by the court when the probation officer informed the court of the mistake. Therefore, appellant was a pretrial detainee awaiting adjudication of whether she was guilty of violating her probation.

tion here is the "elemental" standard of "shock the conscience," which denotes a "very high standard of culpability." *Prince George's County v. Longtin,* 190 Md.App. 97, 138, 988 A.2d 20 (2010), *cert. granted,* 414 Md. 330, 995 A.2d 296 (May 14, 2010). Smith contends that we should apply the due process test articulated in *Robles,* 302 F.3d at 269, of whether the detaining officer's conduct amounted to punishment that was not an incident of some other legitimate government purpose. Smith's argument is strengthened by the fact that *Robles* is based upon the Supreme Court's decision in *Bell v. Wolfish, supra,* as reaffirmed in *Graham* with regard to an excessive force claim of a pre-trial detainee.[12]

The parties do not appear to disagree that the shock-the-conscience standard is the more difficult test for a plaintiff to meet and that the *Bell v. Wolfish* analysis is the more plaintiff-friendly.[13] Equally clear is that the "shock-the-conscience"

---

**12.** *Bell* posited a test for evaluating the constitutionality of "conditions or restrictions" of pre-trial detention. However, *Graham* makes clear that *Bell's* due process analysis applies also to a claim of excessive force while a person is in custody awaiting trial. 490 U.S. at 395, n. 10, 109 S.Ct. 1865.

**13.** *Bell* posits an ends-means analysis:
A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]. Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees. Courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.
441 U.S. at 538–39, 99 S.Ct. 1861(citations and most quotations omitted).

standard is not a one-size-fits-all due process standard for police misconduct.

The origin of "shock the conscience" traces back to *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952). In *Rochin*, deputy sheriffs pumped a suspect's stomach to extract drug capsules he had swallowed during the officers' raid of his home that they conducted based on "some information" that he was selling narcotics. *Id.* at 166, 72 S.Ct. 205. Applying a Fourteenth Amendment due process analysis, the Supreme Court said: "This is conduct that shocks the conscience." [14]

The Supreme Court has continued to apply the shock-the-conscience test in singular contexts despite critics of the standard.[15] In *Collins v. City of Harker Heights*, 503 U.S. 115, 128, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), the court rejected a due process claim that a city's failure to train its employees, or to warn them about known risks of harm was an omission that "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense."

In *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), a case involving a high speed police chase, the Court expounded further that "only the most

---

**14.** At the time the Supreme Court decided *Rochin*, it had not yet held that the Fourth Amendment's exclusionary rule applied to the states, and it therefore used Fourteenth Amendment due process to analyze the search and seizure the officers conducted. Subsequently, the Court held that the Fourth Amendment exclusionary rule applied to the states. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). As a result, the Supreme Court no longer employs the *Rochin* shock-the-conscience standard to search and seizures and instead, uses the Fourth Amendment reasonableness standard. *Lester v. Chicago*, 830 F.2d 706, 710–11 (7th Cir.1987).

**15.** *See, e.g., Herrera v. Collins*, 506 U.S. 390, 428, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (Scalia, J., dissenting) (declaring that he failed to see "the usefulness of 'conscience shocking' as a legal test"); *Gumz v. Morrissette*, 772 F.2d 1395, 1407 (7th Cir.1985) (Easterbrook, J., concurring) ("[A] 'shocks the conscience' test spurns bright lines. It spurns rules. It is a vague standard—if it can be called a standard at all—inviting decisionmakers to consult their sensibilities rather than objective circumstances.").

egregious official conduct can be said to be 'arbitrary in the. constitutional sense,'" *id.* at 846, 118 S.Ct. 1708, and that "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at 849, 118 S.Ct. 1708 (citations omitted). *Lewis* went on to discuss whether "deliberate indifference" should be considered in gauging whether a high speed police chase comported with due process. *Id.* at 851–52, 118 S.Ct. 1708. Concluding that it should not, the Court noted the difference between a police chase and the State's duty to prisoners and detainees and said that the government was not excused "from making provisions for the decent care and protection of those it locks up." *Id.* at 851, 118 S.Ct. 1708.

Two cases of this Court, cited earlier, *see supra,* p. 544–45, 998 A.2d 369, p. 375, involving arrest situations and claims under both Article 24 and Article 26, at first glance, seem to suggest a broader application of the shock-the-conscience standard. In *Williams v. Prince George's County,* 112 Md. App. at 548, 685 A.2d 884, we addressed a claim that a police officer violated an individual's Article 24 rights by detaining the individual for a short time on suspicion of car theft, and said that "[t]he standard pursuant to the Due Process Clause of the Fourteenth Amendment is whether the conduct complained of 'shocks the judicial conscience.'" Likewise, in *Branch v. McGeeney,* 123 Md.App. at 353, 718 A.2d 631, this Court said that "[t]he only police actions that violate substantive due process are those which 'shock the conscience' of the court." However, in both cases, the Court upheld police actions as objectively reasonable under Article 26, equated Article 24 and Article 26 standards, and concluded that, if reasonable under Article 26, the police conduct did not shock the conscience under Article 24. 112 Md.App. at 548, 685 A.2d 884; 123 Md.App. at 351, 353, 718 A.2d 631.[16] In neither case

---

16. While Maryland cases involving excessive force in the course of an arrest equate Article 26 and Article 24 protection, the U.S. Supreme Court, because of its apparent aversion to any expansion of substantive

were we asked to apply the constitutional standard Smith has urged upon us.[17]

We believe Supreme Court cases make it clear that, as a matter of federal due process, pre-trial detainees merit more protection from excessive force than that provided by the elemental shock-the-conscience standard. That is the import of *Lewis*, *Graham*, and *Bell*. As a matter of federal due process, the appropriate constitutional standard is that set forth in *Bell*. Smith argues that under Article 24 of the Declaration of Rights, the same standard should apply. We agree.

 Maryland caselaw repeatedly notes that federal and state due process clauses are interpreted *in pari materia*, but Article 24 has independent protective force and can be interpreted more broadly. *Koshko v. Haining*, 398 Md. 404, 443–44, 921 A.2d 171 (2007).[18] However, what appellee asks us to do is to read Article 24 as sanctioning a *lesser* protection for pretrial detainees than the Supreme Court would require under the Due Process Clause of the 14th Amendment. There is no Maryland authority for such a proposition and, in fact, Article 2 of the Declaration of Rights forbids it, providing that the U.S. Constitution is supreme, "anything in the Constitution or Law of this State to the contrary notwithstanding."

---

due process, would analyze such an issue only under the Fourth Amendment. *See Graham*, 490 U.S. at 395, n. 10, 109 S.Ct. 1865 (finding substantive due process "at best redundant" of a more specific constitutional provision). Of course, if the Court of Appeals were to reject the "continuing seizure" doctrine in cases of excessive force against a pre-trial detainee, *see supra*, pp. 545–47, 998 A.2d 369, 375–77, the claim would be gauged solely on the basis of Article 24, not Article 26.

17. In *Longtin*, a wrongful detention case, this Court recently addressed an issue regarding the appropriate language of a shock-the-conscience jury instruction. 190 Md.App. at 138, 988 A.2d 20. However, there, both parties agreed that shock the conscience was the appropriate test and we were not invited to apply a different standard. *Id.*

18. *See also* William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L.Rev. 459, 500, 502, n. 83, 503 (1977).

■ For these reasons, we conclude that the shock-the-conscience test is not the appropriate standard under Article 24 for gauging the constitutionality of excessive police force with respect to a pre-trial detainee. Rather, the less burdensome test set forth in *Bell* must govern. Thus, we must determine whether Bortner's treatment of Smith amounted to punishment.[19]

### C. Did Appellant's Treatment Amount to Punishment?

■ *Bell* offers guidance on what amounts to punishment of a pretrial detainee:

Not every disability imposed during pretrial detention amounts to "punishment" for due process purposes; once the government has exercised its authority to detain a person pending trial, it is entitled to employ devices that are calculated to effectuate the detention, including confinement in a facility which, no matter how modern or how antiquated, results in restricting the movement of a detainee in a manner in which he would not be restricted if he simply were free to walk the streets pending trial; loss of freedom of choice and privacy are inherent incidents of confinement in such a facility, and the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into "punishment."

441 U.S. at 537, 99 S.Ct. 1861.

The Court also noted that the legitimate governmental interest justifying restraints extended beyond ensuring a detainee's presence at trial:

---

**19.** If the circuit court had applied only the shock-the-conscience standard, we would have been obliged to remand the case for further proceedings. However, in addition to applying the lowest constitutional standard, the court applied the highest standard, the objective reasonableness test for excessive force embodied in Article 26. Clearly, if Smith's claim fails under this standard, Bortner's conduct would not violate her right to substantive due process. *See Branch,* 123 Md.App. at 353, 718 A.2d 631; *Williams,* 112 Md.App. at 548, 685 A.2d 884.

The Government also has legitimate interests that stem from its need to manage the facility in which the individual is detained. These legitimate operational concerns may require administrative measures that go beyond those that are, strictly speaking, necessary to ensure that the detainee shows up at trial. For example, the Government must be able to take steps to maintain security and order at the institution and make certain no weapons or illicit drugs reach detainees. Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial. We need not here attempt to detail the precise extent of the legitimate governmental interests that may justify conditions or restrictions of pretrial detention. It is enough simply to recognize that in addition to ensuring the detainees' presence at trial, the effective management of the detention facility once the individual is confined is a valid objective that may justify imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment.

*Id.* at 546, 99 S.Ct. 1861.

The Court went on to emphasize:

In determining whether restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion, courts must heed our warning that [such] considerations are peculiarly within the province and professional expertise of corrections officials, and, *in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations,* courts should ordinarily defer to their expert judgment in such matters.

*Id.* at 540, n. 23, 99 S.Ct. 1861 (emphasis added) (citations and quotations omitted).

As an example of such an "exaggerated response," the Court said:

[L]oading a detainee with chains and shackles and throwing him in a dungeon may ensure his presence at trial and preserve the security of the institution. But it would be difficult to conceive of a situation where conditions so harsh, employed to achieve objectives that could be accomplished in so many alternative and less harsh methods, would not support a conclusion that the purpose for which they were imposed was to punish.

*Id.* at 539, n. 20, 99 S.Ct. 1861.

Apparently relying on the Court's latter observation, appellant contends that "[n]o evidence was presented or considered regarding less intrusive alternatives to handcuffing and shackling Ms. Smith for 15 hours."[20] Thus, she argues that the police conduct was "so harsh" that we can infer an intent to punish her.

■ Although a truly innocent and injured party, appellant nevertheless has not shown a due process violation committed by the single person she has sued. Bortner is not to blame for most of the alleged misdeeds: the inaccurate court records showing an outstanding warrant, and the failure of Baltimore City police to pick her up and transfer her to their jurisdiction. It was not his job to determine whether the warrant was a mistake. *See State v. Dett,* 391 Md. 81, 100, 891 A.2d 1113 (2006) ("It is ordinarily not for the arresting officer or jailer to determine whether the warrant or detention calling for the arrest of a particular person is valid, was lawfully issued, or properly named the person ordered to be arrested. Those are issues for the court to resolve."). Evidence in the record

---

**20.** In her brief, appellant states that "[t]he only reasonable government purpose was to hold Ms. Smith until she could be picked up by Baltimore City Police" and asks:

Could she not have been more comfortably accommodated in a cell or secure location without handcuffs and shackles? If not, could she have been rotated in a cell with other detainees, or secured in a less injurious and painful manner. The Court below did not consider these questions.

relied upon by the circuit court showed that Bortner was present for only four and one-half hours of her ordeal. Thus, Smith's treatment at the hands of others who are not parties here cannot be laid at Bortner's feet.

More importantly, numerous actions taken by the County police belie an intention to punish appellant. They believed she would be handcuffed and shackled for a temporary period while awaiting transport to Baltimore City. She was not placed in a cell because all three were occupied by men, thus avoiding exposing her to any risk they might present. An officer did explore alternatives by calling a nearby prison that houses women to inquire if there were empty cells. County police called their City counterparts at least twice to hasten appellant's departure and eventually they transported her themselves. She was released from the pole in the fingerprint room and moved into the hallway. She was permitted to use the restroom twice and offered food and drink.

Finally, the police activities were reasonably related to maintaining order and security at the station. Contrary to appellant's proffered alternatives, the police could not allow an arrestee to roam free. The temporary use of handcuffs and shackles is a legitimate security measure. Nor could the police risk opening cells to rotate occupants. And, although the County would have a duty to seek medical attention if a detainee visibly and seriously suffered from diabetic conditions or if custodians knew she was going to be detained for days, no temporary lockup could permit an arrestee to possess a needle to self-inject.[21] Appellant has not shown the "substantial evidence" required by *Bell* that her custodians used excessive force against her.

Although we believe appellant's situation was very regrettable, for the above reasons, we conclude that the circuit court did not err in granting summary judgment in Bortner's favor and finding that Smith's due process rights were not violated.

---

21. Although appellant submitted medical evidence with respect to the effects of the handcuffs and shackles, she presented no evidence that she was harmed by a delay in receiving insulin.

**558**

JUDGMENT OF THE CIRCUIT COURT FOR BALTI-
MORE COUNTY AFFIRMED. COSTS TO BE EQUALLY
DIVIDED BETWEEN THE PARTIES.